UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SOUTHWIND CAPITAL PARTNERS, LLC, | § § § | |
| Plaintiff, | § § | |
| | § | NO. A-15-CV-00646-RP |
| v. | § § | |
| JACK BURKMAN and J.M. BURKMAN & ASSOCIATES, LLC, | § § § | |
| Defendants. | § | |

**PLAINTIFF SOUTHWIND CAPITAL PARTNERS, LLC'S
RESPONSE TO DEFENDANTS' MOTION TO DISMISS
AND REQUEST FOR HEARING**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff SouthWind Capital Partners, LLC ("SouthWind") files this response to Defendants'

motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2),

and in support would show the Court as follows:

**INTRODUCTION**

1.      This is a breach-of-contract case.  SouthWind alleges that the defendants, a federal

lobbyist and his personal LLC, used information obtained under strict confidentiality obligations to

do business directly with SouthWind clients in the State of Texas and elsewhere.  Defendants now

say they cannot be sued in Texas because they worked exclusively out of an office building in

Arlington, Virginia.  That is not the law.  To the contrary, nonresident defendants like those here—

who routinely contract with Texas-based entities and accept millions of dollars in payments for

work intended to benefit those clients in Texas—are subject to personal jurisdiction in Texas.  There

is no proper basis for the request to dismiss this case for lack of personal jurisdiction.  The

Defendants are subject to both specific and general jurisdiction in Texas, under the allegations at issue in the case and factual record developed in connection with this motion.

## ARGUMENT

**A.      Legal standard governing a Rule 12(b)(2) motion to dismiss.**

2.      "Once a motion to dismiss for lack of personal jurisdiction has been presented to a district court by a nonresident defendant, the party who seeks to invoke the jurisdiction of the district court bears the burden of establishing contacts by the nonresident defendant sufficient to invoke the jurisdiction of the court." *WNS, Inc. v. Farrow*, 884 F.2d 200, 203 (5th Cir. 1989). Where a motion is decided based on affidavits and deposition testimony, rather than through a full evidentiary hearing, the plaintiff's burden is only to establish a prima facie case for personal jurisdiction. *Id.* The Court should take all uncontroverted allegations in the complaint as true, and resolve any factual disputes in the plaintiff's favor. *Id.*; *see also Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th Cir. 1999) ("Where facts are disputed, the plaintiff presenting a prima facie case is entitled to have the conflicts resolved in his favor.").

**B.      Defendants have extensive contacts with the State of Texas.**

3.      The Court is well familiar with the general rules governing personal jurisdiction, which are discussed in more detail below.  The central question is whether the nonresident defendants have sufficient "contacts" with the State of Texas.  In this case, Defendants have significant and ongoing contacts with Texas, including multiple contracts with Texas entities and numerous Texas-based customers, worth millions of dollars in value.

**1.      Defendants executed a valid and enforceable contract with SouthWind, a Texas LLC.**

4.      The agreement at the core of this lawsuit is a Mutual Non-Disclosure and Non-Circumvention Agreement, colloquially referred to by the parties as the "NDNC."  *See* Ex. B.

The NDNC is a five-year term contract with an effective date of June 3, 2013.  *Id.* at 1.  It contains a Texas choice of law clause.  *Id.*, § 5.4.  As set out more fully in SouthWind's original lawsuit filing, the NDNC generally precludes Defendants from doing business with individuals or companies to whom they were introduced by SouthWind, unless SouthWind consents and executes a commission agreement with Defendants beforehand.  *Id.*, § 4; *see also id.* at 2 (Non-Compete Clause).  The three-page contract is initialed on each page by both Mr. Burkman and by SouthWind's principal, Bryan Nowak.[1]  *Id.* at 1–3.  The first paragraph of the NDNC recites that the agreement is "by and between [SouthWind] and Jack Burkman."  *Id.* at 1.  The final page of the NDNC is signed by Mr. Burkman,[2] on behalf of "Burkman LLC."[3]  *Id.* at 3.  It is not signed by Mr. Nowak.  *Id.*

5.      Roughly two years after the NDNC was executed, and shortly after this litigation began, Defendants adopted the surprising position that the NDNC is unenforceable because it lacks Mr. Nowak's signature on the final page.  That position is legally unsupportable given the overwhelming evidence of the parties' intent and course of conduct.  Furthermore, even if the Court were to conclude that there was a fact dispute as to the parties' intent to be bound by the

---

[1] Mr. Burkman claims, in his affidavit, that he has not "ever met Bryan Nowak."  Ex. C, at 1. That statement is misleading at best, giving the false impression that Mr. Burkman does not know the principal of the company with whom he and his LLC repeatedly contracted.  But as Mr. Burkman admitted in his deposition, he frequently speaks with Mr. Nowak.  Ex. D, at 41:12–19 ("Q: You've met Bryan, haven't you? A: Never. I've never met Bryan. Q: You talk with him frequently, don't you? A: Yes. Well, yes, during periods of time. We had a lot of conversation. Never met him.").

[2] In his deposition, Mr. Burkman did not deny signing the NDNC, but purported to have no memory of doing so.  Ex. D, at 23:3–24:3.  In the motion to dismiss, and in Mr. Burkman's affidavit attached to the motion, Mr. Burkman admits the contract was "signed on behalf of JMB & Associates." *See* Defs.' Mot. Dism. [#3], at 3; Ex. C, at 1.

[3] Mr. Burkman has testified that "Burkman LLC" is "shorthand" for Defendant J.M. Burkman & Associates, LLC.  Ex. D, at 8:23–9:5.

3

terms of the NDNC, the Court would still resolve that dispute in SouthWind's favor for purposes of deciding the personal jurisdiction question.  *See Wien Air*, 195 F.3d at 211.

6.     "Under the general rules of contract law, a party is bound by the terms of the contract that he has signed, except upon a showing of special circumstances."  *Hearthshire Braeswood Plaza Ltd. P'ship v. Bill Kelly Co.*, 849 S.W.2d 380, 392 (Tex. App.—Houston [14th Dist.] 1993, writ denied).  The only possible "special circumstance" Defendants have raised is the absence of Mr. Nowak's signature from the final page of the NDNC.[4]  But Texas law is settled that "for a contract to be valid, it is not necessary that the agreement be signed by both parties."  *Id.*; *Thomas J. Sibley, P.C. v. Brentwood Inv. Dev. Co.*, 356 S.W.3d 659, 663 (Tex. App.—El Paso 2011, pet. denied) ("[T]he absence of a party's signature does not necessarily destroy an otherwise valid contract."); *Augusta Dev. Co. v. Fish Oil Well Servicing Co.*, 761 S.W.2d 538, 544 (Tex. App.—Corpus Christi 1988, no writ) ("However, in order to constitute a contract in writing, a writing does not necessarily have to be signed by both parties, so long as the party not signing accepts the contract by his acts, conduct or acquiescence.").

7.     When only one party signs a contract, the question of validity turns on whether the *non-signatory*—here, SouthWind, as the party seeking to enforce the agreement—intended to accept the contract and be bound by its terms.  *Augusta Dev. Co.*, 761 S.W.2d at 544.  "A party may accept a contract, and indicate its intent to be bound to the terms by acts and conduct in accordance with the terms."  *Thomas J. Sibley*, 356 S.W.3d at 663.  That is precisely what SouthWind did in this case.  First, Mr. Nowak indicated SouthWind's intent to be bound by the

---

[4]In his deposition, Mr. Burkman testified he called Mr. Nowak at some time during a six-week period following the execution of the NDNC to ask about Mr. Nowak's missing signature.  Ex. D, at 30:13–31:20.  Mr. Nowak denies any such conversation ever took place.  Ex. A (Nowak Aff.) ¶5.  Mr. Burkman also alleged there "might be" emails sent from him to Mr. Nowak about this issue, but Mr. Burkman was unable to provide a copy of any such emails, other than an email sent on August 4, 2015, well after this litigation commenced.  Ex. D, at 31:21–32:8.  Mr. Nowak denies receiving any such emails, other than the August 4, 2015 email.  Ex. A ¶ 5.

contract by initialing every page of the contract.  Ex. A (Nowak Aff.) ¶4 ("[SouthWind] has always intended to be bound by the terms of the NDNC, and has considered the NDNC a binding and enforceable agreement since June 3, 2013.").  Second, SouthWind fully performed in accordance with the terms of the NDNC.  SouthWind shared confidential information with Defendants, introduced Defendants to confidential SouthWind clients, sources, and leads, and paid Defendants hundreds of thousands of dollars pursuant to joint consulting agreements formed because of the NDNC.  *Id.* ¶6.

8.    There is before the Court an abundance of evidence that Defendants also intended to be bound by the terms of the NDNC, and acted accordingly.  First, Defendants signed the contract.[5]  "[A] party's signature on a written contract is strong evidence that the party unconditionally assented to its terms."  *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App.—El Paso 2004, orig. proceeding).  Second, Defendants accepted benefits under the contract, receiving confidential information from SouthWind and executing joint consulting agreements with SouthWind's clients.  Mr. Burkman admits in his affidavit that he serves Texas-based clients "pursuant to the contract made the basis of this suit."  Ex. C, at 2.  It would be illogical to suggest one serves clients "pursuant to" a non-existent contract.  At issue in the case are Defendants' breaches of the NDNC by circumventing SouthWind with respect to business done with SouthWind clients, but those acts were only made possible because of the contract under which SouthWind disclosed those clients.  Third, on April 23, 2015—almost two years after the contract was formed—Mr. Burkman sent Mr. Nowak an email entitled "Official Notice," which

---

[5]Mr. Burkman's deposition testimony supports the contract principles at issue.  For example, Mr. Burkman described an unsigned contract with one Texas client as setting out the terms of their agreement despite neither party signing the document.  Ex. D, at 114:6–116:3.  Describing his work with a different Texas client, Mr. Burkman testified the written contract was "irrelevant" to the client's status and to the work performed for that client.  *Id.* at 133:4–11.  This is consistent with Mr. Burkman's personal preference to "do everything on a handshake" rather than by written agreement.  *Id.* at 145:23–146:1.

stated that the email was to "serve as official notice of termination" of the NDNC.[6]   Ex. E.
Defendants' actions, as opposed to some of the words they use in the motion to dismiss,
demonstrate a consistent belief that the NDNC was at all times a binding and enforceable
agreement.

9.      Texas courts have enforced unilaterally signed contracts in similar scenarios.  In
*Thomas J. Sibley*, a commercial landlord failed to sign a lease agreement with a law firm tenant.
356 S.W.3d at 663.  The firm nevertheless moved into the space and made rent payments, and
the landlord operated the leased space in accordance with the lease terms.  *Id.* at 663–64.  The
Texas court of appeals concluded those facts failed to even "create a fact issue as to the parties'
mutual assent to the agreement," and held the lease was enforceable.  *Id.* at 664.  Similarly, in
*Hearthshire*, the court of appeals held an apartment complex owner's missing signature on a
renovation contract was no bar to enforcement, as the parties' course of conduct in performing
the renovations showed the owner's intent to be bound.  849 S.W.2d at 392.  The same result is
appropriate here, given the uncontroverted evidence of SouthWind's intent to be bound by the
contract and the parties' course of conduct under the terms of the agreement.

## 2. Defendants perform a substantial amount of work for Texas-based clients.

10.      Under the terms of the NDNC, Defendants were provided with a significant
number of business leads, many of which developed into client relationships.  As a result,
Defendants are parties to a variety of "joint consulting agreements" with SouthWind and

---

[6]Mr. Burkman testified he sent this email, despite believing the contract was never enforceable, to
"call back" his signature—in other words, to prevent SouthWind from subsequently executing the
agreement and binding Defendants to its terms.  Ex. D, at 36:17–37:15 ("You can't leave your signature
hanging, because if you leave your signature hanging, somebody could just execute a document").  But
two months later, on July 29, 2015, Mr. Burkman sent Mr. Nowak another email asking him to "ratify and
execute" the NDNC by signing it.  Ex. F.  Mr. Burkman's express attempt to have SouthWind "ratify and
execute" the NDNC belies any notion that Mr. Burkman had "call[ed] back" his signature two months
earlier to prevent that exact scenario from happening.

numerous Texas-based entities. There are at least fifteen such agreements currently in force. Ex. A (Nowak Aff.) ¶7. Those agreements also contain Texas choice-of-law clauses. *Id.*

11.     In addition to the parties' joint relationships, Defendants also have a substantial number of Texas-based clients either introduced to them by SouthWind or obtained independently from some other source. In a verified response to an interrogatory asking Defendants to identify all Texas-based clients for whom they have ever performed work, Defendants listed eight clients. Ex. G, at 2. Defendants had (or have) contracts with many of those clients. *E.g.*, Ex. H (contract with MediGLIDER Corporation); Ex. I (same); Ex. D, at 105:11–15, 111:24–113:16. In a separate discovery response, Defendants admitted to receiving nearly $400,000 from those Texas-based clients, in addition to $576,750 from SouthWind. Ex. J.

12.     During his deposition, Mr. Burkman further admitted that his first verified interrogatory response that listed only eight Texas-based clients was inaccurate, as he was "made aware" (apparently only through deposition questions and exhibits presented to him by SouthWind counsel) of dozens of additional Texas-based clients. Ex. D, at 179:7–24. The day before this response was filed, Mr. Burkman supplemented his interrogatory answer and disclosed *nineteen additional* Texas-based clients. Ex. M. Those Texas-based clients have paid Defendants, according to Defendants' publicly filed lobbying disclosure forms, more than $3.7 million. Ex. K.

13.     With respect to these belatedly disclosed Texas-based clients, the record shows that some of them were specifically introduced to Defendants through SouthWind, pursuant to the confidentiality and anti-circumvention protections of the NDNC. For example, SouthWind introduced Mr. Burkman to a Texas-based company called Servergy Inc., with whom SouthWind had been working since late 2012. Ex. A (Nowak Aff.) ¶6. Mr. Burkman only included

Servergy in his supplemental interrogatory response listing his Texas-based clients, after being asked about his work with Servergy at his deposition.

14.     Beyond the payments Defendants received from these clients, Defendants' work was intended to have a significant effect in Texas.  Defendants provide lobbying services.  Those lobbying services include: (1) writing, submitting, and negotiating federal grant proposals on behalf of clients; (2) obtaining earmarks or appropriations for clients through federal spending bills; and (3) placing clients in federal government contracts.   Ex. D, at 11:12–13:14. Defendants attempted to use all three of those methods for numerous Texas clients, with full knowledge that their efforts—if successful—would result in federal funds flowing to Texas.  For example, Defendants attempted to obtain a multi-million-dollar grant from the Department of Energy for one Texas-based client.  *Id.* at 161:13–162:5.   For another client, Defendants attempted to obtain up to $10 million in grant funding and $12 million in federal contract funding, which Defendants knew would have flowed back to that client in Texas.  *Id.* at 123:7– 124:8.  Defendants also attempted to get money appropriated through federal spending bills for use by Texas-based clients.  *Id.* at 137:3–10.  The fact that Defendants were never successful does not detract from the reality of Defendants' business operation in Texas, which was marketed and designed to funnel hundreds of millions of federal dollars back to Texas.

15.     Defendants also have frequent contacts with citizens of the State of Texas.  For example, a review of Defendants' business-related telephone traffic from June 2013 through October 2015 reveals more than 1,100 phone calls placed to Texas-based numbers, which averages out to more than one business-related phone call to the State of Texas per day over that 28-month period.  Ex. L.

16.     In a sworn affidavit put before this Court in connection with the Defendants' motion, Mr. Burkman attested that he was last in Texas twelve years ago (*i.e.*, in 2003).  Ex. C, at 1–2.  When that attestation was tested at deposition, Mr. Burkman was ultimately forced to admit that the statement was inaccurate.  Mr. Burkman was in Texas in November 2013, and again in November 2015, shortly after executing his incorrect affidavit that he placed before this Court.  Ex. D, at 51:10–52:13.

**C.     Defendants are subject to personal jurisdiction in the State of Texas.**

17.     "A federal court sitting in diversity may exercise personal jurisdiction over a non-resident defendant (1) as allowed under the state's long-arm statute; and (2) to the extent permitted by the Due Process Clause of the Fourteenth Amendment."  *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 (5th Cir. 2009).  "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis."  *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).  "Federal due process requires a plaintiff to prove: (1) that the non-resident purposely availed himself of the benefits and protections of the forum state by establishing minimum contacts with the state; and (2) that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice."  *Id.* (internal quotation marks omitted).

18.     "There are two types of minimum contacts: those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction."  *Id.* (internal quotation marks omitted).  Defendants are subject to jurisdiction under both tests.

**1. Defendants' contacts support the exercise of specific jurisdiction.**

19.     The Fifth Circuit has "articulated a three-step analysis for the specific jurisdiction inquiry."  *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).  The Court must consider:

> (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Id.* (internal quotation marks omitted).  "If the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable."  *Id.*

**<u>Prong One: Minimum Contacts through Purposeful Availment</u>**

20.     The "constitutional touchstone" of this analysis, captured by the first prong outlined above, is the concept of foreseeability:  whether the nonresident defendant's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."   *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76 (1985) (internal quotation marks omitted).  As the Supreme Court has explained:

> Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a substantial connection with the forum State. Thus where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Id.* at 475–76 (internal quotation marks and citations omitted).

21.     "[E]ven a single act can support jurisdiction."  *Id.* at 475 n.18.  The Supreme Court has therefore upheld the exercise of specific jurisdiction by a California court over an Arizona insurance company based on that company's one and only life insurance policy covering a California resident.  *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222–23 (1957); *see also Benjamin v. W. Boat Bldg. Corp.*, 472 F.2d 723, 726 (5th Cir. 1973) (emphasizing that "very little purposeful activity within a state is necessary to satisfy the minimum contacts requirement").

22.     For purposes of this case, Defendants' primary contact with Texas is the NDNC, a five-year contract Defendants knowingly negotiated and executed with a Texas-based company.  The NDNC exists because Mr. Burkman took the affirmative step of reaching out to SouthWind in Texas to form a business relationship.  Ex. A (Nowak Aff.) ¶3.  That agreement expressly contemplated an ongoing, continuous business relationship whereby SouthWind could bring potential lobby clients to Defendants and the parties could ultimately negotiate joint consulting agreements intended to raise capital for the clients.  Defendants have been and currently are parties to a number of those joint consulting agreements, including with Texas-based clients.  Far from executing a single, one-time contract, Defendants intentionally began a long-term business relationship that was meant to, and in fact did, lead to additional contracts with Texas-based entities.

23.     Two decisions from the Fifth Circuit illustrate how comfortably the facts of this case fit within the scope of the specific jurisdiction inquiry.  In the first, the court affirmed a Texas court's exercise of personal jurisdiction over an Illinois-based law firm which had represented a Dallas-based company in a variety of legal matters of the course of eight years.  *Trinity Indus., Inc. v. Myers & Assocs., Ltd.*, 41 F.3d 229, 232–32 (5th Cir. 1995).  That legal

representation, while primarily occurring in Illinois, "required regular mail and telephonic communications with Texas and, on occasion, physical presence for meetings in Dallas." *Id.* at 231.  The court explained the law firm's contacts with Texas were not "random, fortuitous, or incidental," but rather the result of a deliberate effort to establish "an ongoing relationship with a Texas client." *Id.*  Accordingly, the court held the law firm "reasonably should have anticipated the possibility of being haled into court in Texas for claims arising out of or related to that relationship." *Id.*  "As the Court observed in *Burger King*, an individual who purposefully directs his activities to forum state residents and derives benefits therefrom should be answerable in the forum for the consequences of his activities; 'the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed.'" *Id.* (quoting *Burger King*, 471 U.S. at 474).

24.     In *Central Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376 (5th Cir. 2003), the Fifth Circuit reversed the district court's decision to grant a motion to dismiss on the basis of personal jurisdiction.  That case involved a Texas-based freight company who contracted with a New Jersey-based freight company to share each other's services in their respective operating areas.  *Id.* at 379.  The court explained that even though the New Jersey firm had negotiated the agreement with the Texas firm "via telephone and written correspondence between the two parties from their respective headquarters," the New Jersey firm "can not really dispute the fact that, during the course of negotiations, [it] specifically and deliberately reached out to a Texas corporation by telephone and mail with the deliberate aim of entering into a long-standing contractual relationship with a Texas corporation." *Id.* at 382 (internal quotation marks omitted).  The court held the New Jersey company's knowledge that the Texas company was based in Texas, and therefore its presumed knowledge that many customers would be Texas

customers, made it foreseeable that the contract would generate business activity in Texas. *Id.* The New Jersey company therefore "should have reasonably anticipated being haled into court in Texas on breach of contract claims . . . notwithstanding [the New Jersey company's] relatively brief *physical* presence in the state." *Id.* at 383.

25.     Like the law firm in *Trinity Industries*, and the freight company in *Central Freight Lines*, Defendants deliberately forged an ongoing contractual relationship with a Texas company, SouthWind, as well as a variety of other Texas-based clients. Defendants cannot hide behind the fact that they negotiated the NDNC from Virginia: the court rejected such an argument in *Central Freight Lines*, explaining that even telephonic negotiations across state lines demonstrated a deliberate effort to reach out to the State of Texas. *See id.* at 382. Additionally, Defendants knew their primary contract, the NDNC, was with a Texas-based company, and therefore "presumably knew" that many of the leads generated by SouthWind would be from Texas-based companies as well. *See id.* Such a presumption is not even necessary in this case, as Mr. Burkman has admitted he knew his lobbying work for Texas clients was intended to send federal funds back to those companies in Texas. Defendants purposefully contracted with SouthWind, as well as a variety of other Texas-based companies, and received millions of dollars in benefits as a result. Defendants cannot use the Due Process Clause to avoid answering for their unlawful conduct in the State of Texas. *See Trinity Indus.*, 41 F.3d at 231.

26.     Defendants' motion and affidavit make much of the allegation that Defendants have not set foot in Texas in over a decade (which Mr. Burkman has now admitted under oath is untrue) and performed their work entirely in Virginia. Neither of these allegations is sufficient to defeat jurisdiction in this case. It is well-settled that a defendant cannot avoid jurisdiction "merely because the defendant did not *physically* enter the forum State." *Burger King*, 471 U.S.

at 476; *see also Cent. Freight Lines*, 322 F.3d at 385 (holding a nonresident defendant "may not avoid the personal jurisdiction of the Western District of Texas merely because [it] did not physically enter the State of Texas to deliver freight to customers").  This rule recognizes the "inescapable fact of modern life" that business is now easily transacted across state lines.  *Cent. Freight Lines*, 322 F.3d at 385.  As the Fifth Circuit has held, "even if the defendant performs no physical act within the State, activities outside the State can provide adequate contacts if they have reasonably foreseeable consequences within the State."  *Standard Fittings Co. v. Sapag, S.A.*, 625 F.2d 630, 643 (5th Cir. 1980) (internal quotation marks omitted); *see also Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 496, 499 (5th Cir. 1974), *overruled on other grounds, Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702–03 (1982) (French explorer, who contracted with Texas company to design and test a fish call in Monaco and France and submit a report to Texas company, subject to personal jurisdiction in Texas).  Here, the Texas-based consequences of Defendants' actions were not only readily foreseeable, they were actually foreseen by the Defendants.  *E.g.*, Ex. D, at 123:23–124:7 ("Q: And you knew that [money from grants and federal contracts] would have gone to [MediGLIDER Corporation] in Texas. Right? A: Yes. Right. Correct.").

27.     Another important factor weighing in favor of purposeful availment is the NDNC's Texas choice-of-law clause.  The Supreme Court has confirmed that such clauses must be considered as part of the purposeful availment analysis, as a choice-of-law clause "reinforce[s] [a defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."  *Burger King*, 471 U.S. at 482.  Purposeful availment can be shown by the fact that a nonresident defendant "enter[ed] into contracts expressly providing that [the forum state's laws] would govern [contractual] disputes."  *Id.*  That is

precisely the case here.  That makes these facts an even more compelling case for exercising jurisdiction than in *Central Freight Lines*, where the contract contained no such clause.  322 F.3d at 383.  In addition, the contract's *lack* of any forum-selection clause (*e.g.*, a provision requiring suits to be filed in Virginia) weighs in favor of jurisdiction, because it "suggests that [the defendant] did not structure the transaction to avoid being haled into court" in the forum state.  *Peters v. Top Gun Executive Grp.*, 396 S.W.3d 57, 71 n.11 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see also Cent. Freight Lines*, 322 F.3d at 383 (lack of forum-selection clause does not give a nonresident defendant "any reason to think that it could *not* be haled into court in Texas").

**Prong Two: A Cause of Action Arising out of Defendants' Contacts**

28.     Defendants' motion does not dispute that this breach-of-contract case "arises out of" and is "related to" Defendants' contacts with the State of Texas, most notably the NDNC.  *See Trinity Indus.*, 41 F.3d at 231–32 (breach-of-fiduciary-duty and negligence claims against attorneys arose out of contacts with Texas, "where the professional obligations attached").  But for Defendants' decision to reach out to SouthWind, negotiate the NDNC, and execute the NDNC, this lawsuit would not exist.  But SouthWind's allegations go beyond just the NDNC.  SouthWind alleges Defendants breached the NDNC by circumventing SouthWind and negotiating deals with SouthWind clients and leads without SouthWind's consent or involvement.  Accordingly, Defendants' contracts with *other Texas-based clients* are also highly relevant, and SouthWind's claims also "arise out of" those additional contacts with the State of Texas beyond the NDNC.

**Prong Three: Fair Play and Substantial Justice**

29.     Defendants' motion also raises no argument that the exercise of jurisdiction over Defendants would "offend traditional notions of fair play and substantial justice." *Id.* at 230. Because Defendants bear the burden to prove this prong, their failure to raise the issue should settle the matter. *Seiferth*, 472 F.3d at 271.

30.     Even if Defendants had raised the issue, there can be no serious argument that litigating this case in Texas would be unfair or unreasonable.   "In determining whether the exercise of jurisdiction is fair and reasonable, the court must balance: (1) the burden on the nonresident defendant of having to defend itself in the forum; (2) the interests of the forum state in the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the states in furthering fundamental social policies." *Cent. Freight Lines*, 322 F.3d at 384.

31.     All of these factors weight in favor of exercising jurisdiction.  Defendants have not shown they would suffer any great burden litigating in Texas.  Certainly they would suffer no more burden than SouthWind would suffer if forced to litigate this case in Virginia.  Moreover, because Defendants purposefully availed themselves of the benefits and protections of Texas law, it is "presumptively not unreasonable to require [them] to submit to the burdens of litigation in that forum as well." *Burger King*, 471 U.S. at 476.  The State of Texas has a significant interest in allowing its own citizens to obtain relief when their contracts are breached. *Cent. Freight Lines*, 322 F.3d at 384.  SouthWind's interest in obtaining convenient and effective relief "suggests that the Western District of Texas is not an unfair or unjust place to litigate this

16

dispute." *Id.* at 385. Finally, there are no efficiency concerns or social policy concerns that make Texas an unreasonable forum.

32.    The only possible fact Defendants raise to suggest litigating in Texas would be unfair is the idea that this case is likely to require testimony of members of Congress and witnesses in the Washington, D.C. area. But that vague contention makes no sense in the context of SouthWind's claims. This case is not concerned with whether Defendants properly performed their lobbying obligations. Instead, the focus of this case is whether Defendants improperly circumvented SouthWind and transacted business with SouthWind clients and leads in violation of the NDNC. Members of Congress and unnamed witnesses in the Washington, D.C. area, other than Mr. Burkman himself, will not be witnesses to those issues. In fact, many more of the key witnesses to these issues will be located in Texas, as representatives of the clients at issue in this motion.

### 2. Alternatively, Defendants' contacts support the exercise of general jurisdiction.

33.    "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *see also Int'l Shoe*, 326 U.S. at 318 (explaining general jurisdiction may be exercised based on a nonresident defendant's "continuous corporate operations within a state"). While the "paradigm [home] forum" for a corporation is its place of incorporation or its principal place of business, there is no bright-line rule that *only* those two locations are appropriate forums for exercising general jurisdiction. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) ("*Goodyear* did not hold that a corporation

17

may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums."); *see also id.* at 761 n.19 (recognizing the possibility that "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State"). Rather, the Supreme Court "used the phrase 'at home' to signify that in order for an out-of-state defendant to be subject to general jurisdiction, its continuous and substantial contacts with a forum State must be akin to those of a local enterprise that actually is 'at home' in the State." *Id.* at 769 (Sotomayor, J., concurring).

34.     Although Defendants are citizens of Virginia, their contacts with the State of Texas are "akin to those of a local enterprise that actually is 'at home'" in Texas. *See id.* A hypothetical federal lobbying firm based in Texas would operate in much the same way as Defendants, including performing many of its obligations in the Washington, D.C. area, despite being undeniably "at home" in Texas. Defendants routinely contract with Texas entities, and those contracts bring with them the benefits and protections of Texas law, often expressly through Texas choice-of-law clauses. Defendants interact with Texas entities on a daily basis. Although Defendants are ostensibly performing work in our nation's capital, Defendants (and their Texas-based clients) know their efforts will, if successful, bring federal dollars to the Lone Star State. Texas clients pay dearly for those services, having contributed nearly five million dollars to Defendants' coffers in the last half dozen years. These are precisely the kind of "continuous corporate operations" in a state that justify the exercise of personal jurisdiction. *See Int'l Shoe*, 326 U.S. at 318.

35.     As in the specific jurisdiction context, Defendants' broader contacts with the State of Texas demonstrate a history of "purposeful availment." *See Burger King*, 471 U.S. at 475.

Defendants did not form service-based contractual relationships with dozens of Texas customers randomly; rather, Defendants made purposeful decisions to locate and serve such customers through personal marketing efforts as well as through intermediaries like SouthWind.   In the words of the Supreme Court, it was actions "by the defendant *himself* that create[d] a 'substantial connection' with the forum state."  *See id.*  As the Court explained in *Burger King*,

> where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Id.* at 475–76 (internal quotation marks and citations omitted).  Having deliberately taken on dozens of Texas-based clients over several years, Defendants cannot now be heard to complain that they could not "reasonably anticipate being haled into court" in Texas.  *See id.* at 474.

## CONCLUSION

For the foregoing reasons, Plaintiff SouthWind Capital Partners, LLC respectfully requests the Court deny Defendants' motion to dismiss on the basis of personal jurisdiction.  To the extent the Court would consider granting a hearing on the motion, SouthWind respectfully requests the Court set this motion for hearing at the Court's convenience.

Respectfully submitted,

BECK | REDDEN LLP

By: _____/s/ Eric J.R. Nichols_____
        Eric J.R. Nichols
        State Bar No. 14994500
        enichols@beckredden.com
        Karson Karl Thompson
        State Bar No. 24083966
        kthompson@beckredden.com
515 Congress Avenue, Suite 1900
Austin, Texas 78701
Tel:      512-708-1000
Fax:      512-708-1002

**ATTORNEYS FOR PLAINTIFF
SOUTHWIND CAPITAL PARTNERS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this filing was served on the following persons on

March 11, 2016, through the Court's electronic filing system and by email.

**Counsel for Defendants**
Michael M. Probus, Jr.
Probus Law Firm, PLLC
1701 Directors Blvd., Suite 290
Austin, Texas 78744
mike@probuslawfirm.com

*/s/ Karson Thompson*
Karson Thompson
